NOS. 14-2222, 14-2339

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

NESTLÉ DREYER'S ICE CREAM COMPANY,

Petitioner-Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

ON PETITION TO REVIEW AND APPLICATION FOR ENFORCEMENT OF
AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

**BRIEF OF PETITIONER-CROSS-RESPONDENT NESTLÉ DREYER'S
ICE CREAM COMPANY**

BERNARD J. BOBBER
RYAN N. PARSONS

FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.271.2400
bbobber@foley.com
rparsons@foley.com

*Counsel for Petitioner-Cross-Respondent*

**Oral Argument Requested**

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for petitioner-cross-respondent furnishes the following statement in compliance with Rule 26.1 of the Federal Rules of Appellate Procedure:

1.  Does party/amicus have any parent corporations? If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

    **Petitioner-cross-respondent is wholly-owned by Dreyer's Grand Ice Cream Holdings Inc., which is wholly owned by Nestlé Prepared Foods Company, which is wholly owned by The Stouffer Corporation, which is wholly owned by TSC Holdings Inc., which is wholly owned by Nestlé Holdings, Inc., which is wholly-owned by Nestlé S.A., a Swiss corporation that is publicly traded in Switzerland.**

2.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation? If yes, identify all such owners:

    **No publicly held company owns 10% or more of petitioner-cross-respondent's stock.**

3.  Does any publicly held corporation, whether or not a party to the present litigation, have a direct financial interest in the outcome of the litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement?

    **No.**

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ 1

TABLE OF CONTENTS ............................................................................................ 2

JURISDICTIONAL STATEMENT ............................................................................ 9

STATEMENT OF THE ISSUES ................................................................................ 11

STATEMENT OF THE CASE .................................................................................. 12

STATEMENT OF FACTS ........................................................................................ 16

I.    THE FACILITY AND ITS HISTORY .......................................................... 16

II.   THE CURRENT PETITION ........................................................................ 17

III.  THE REPRESENTATION HEARING ........................................................ 18

      A.   Working Conditions ........................................................................ 19

      B.   Wages and Benefits ........................................................................ 21

      C.   Terms of Employment .................................................................... 23

      D.   Integration of Production and Maintenance Roles ........................ 25

IV.   REGIONAL DIRECTOR AND BOARD DECISIONS ................................ 27

V.    UNFAIR LABOR PRACTICE PROCEEDINGS ........................................ 28

SUMMARY OF ARGUMENT ................................................................................ 30

ARGUMENT ........................................................................................................ 32

I.    STANDARD OF REVIEW ........................................................................ 32

II.   THE BOARD'S ADOPTION OF THE OVERWHELMING-COMMUNITY-OF-
      INTEREST TEST VIOLATES THE NATIONAL LABOR RELATIONS ACT. ... 32

      A.   *Lundy Packing.* ............................................................................ 34

      B.   *Specialty Healthcare.* .................................................................. 36

      C.   The Overwhelming-Community-of-Interest Test Violates the National
           Labor Relations Act by Giving Controlling Weight to the Extent of
           Union Organization. ...................................................................... 39

III.  THE BOARD FAILED TO PROVIDE A REASONED EXPLANATION FOR ITS DEPARTURE FROM PRIOR BOARD DECISIONS WHEN ADOPTING THE OVERWHELMING-COMMUNITY-OF-INTEREST TEST................................... 44

    A.  An Agency Is Required to Provide a Reasoned Explanation to Support a Departure from Prior Precedent. .......................................... 45

    B.  The Court Need Not Defer to the Board's Claim that its Decision Clarified the Law, Rather than Changed the Law. ............................. 46

    C.  *Specialty Healthcare* Changed Board Law on Unit Determinations.  47

        1.  *The Board's Support for its Prior Use of the "Overwhelming" Test in* Specialty Healthcare *Is Almost Non-Existent.* .............. 48

        2.  *The Mechanics of the Test Articulated in* Specialty Healthcare *Are Inconsistent with the Board's Prior Standard.* .................... 50

        3.  *The* Specialty Healthcare *Test Is Inconsistent with Prior Results in Production-and-Maintenance Cases.* ........................................ 52

        4.  *Prior to Specialty Healthcare, "Overwhelming Community of Interest" Was Relevant Only to Accretion Cases.* ........................ 55

        5.  *Because the Board Did Not Adequately Explain its Departure from Prior Precedent in Specialty Healthcare, its Decision Is an Abuse of Discretion.* .................................................................... 56

IV.  THE ADOPTION OF THE OVERWHELMING-COMMUNITY-OF-INTEREST TEST VIOLATED THE ADMINISTRATIVE PROCEDURE ACT ........................ 58

V.  REGARDLESS OF THE TEST USED, ORDERING AN ELECTION FOR ONLY THE MAINTENANCE EMPLOYEES WAS CONTRARY TO THE LAW OF THIS CIRCUIT ........................................................................................ 62

CONCLUSION ........................................................................................ 65

STATEMENT ON ORAL ARGUMENT ..................................................... 66

FORM AND LENGTH CERTIFICATION .................................................. 67

CERTIFICATE OF SERVICE .................................................................. 68

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*AGI Klearfold, LLC*,
   350 NLRB 538 (2007) ...................................................................................50

*Am. Fed'n of Labor v. NLRB*,
   308 U.S. 401 (1940)......................................................................................28

*American Cyanamid Co.*,
   131 NLRB 909 (1961) ...................................................................................60

*Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*,
   164 F.3d 867 (4th Cir. 1999) ...............................................................32, 46

*Arcadian Shores, Inc. v. NLRB*,
   580 F.2d 118 (4th Cir. 1978) ........................................................................41

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
   412 U.S. 800 (1973)......................................................................................45

*Atl. Richfield Co.*,
   231 NLRB 31 (1977) .....................................................................................51

*Barbara George, Inc.*,
   273 NLRB 1239 (1984) .................................................................................51

*Buckhorn, Inc.*,
   343 NLRB 201 (2004) ..............................................................................53, 54

*C&K Mkt., Inc.*,
   319 NLRB 724 (1995) ...................................................................................51

*Chamber of Commerce v. Brown*,
   554 U.S. 60 (2008)........................................................................................40

*Commc'ns Workers of Am. v. Beck*,
   487 U.S. 735 (1993)......................................................................................40

*N.C. ex rel. Cooper v. Tenn. Valley Auth.*,
   615 F.3d 291 (4th Cir. 2010) ........................................................................59

*Detroit Edison Co. v. EPA*,
   496 F.2d 244 (6th Cir. 1974) ........................................................................47

*F&M Schaefer Brewing Co.*,
   198 NLRB 323 (1972) ...................................................................................54

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................45

*Ford Motor Co. v. FTC*,
  673 F.2d 1008 (9th Cir. 1981) ...............................................58

*Harrah's Club*,
  187 NLRB 810 (1971) ............................................................51

*Home Depot USA, Inc.*,
  331 NLRB 1289 (2000) ..........................................................51

*Huntington Ingalls, Inc. v. NLRB*
  (4th Cir., No. 12-2000) ...........................................................14

*J.P. Stevens & Co., Inc. v. NLRB*,
  623 F.2d 322 (4th Cir. 1980) ............................................45, 57

*Kindred Nursing Centers East, LLC v. NLRB*,
  727 F.3d 552 (6th Cir. 2013) ..................................................38

*Laneco Constr. Sys., Inc.*,
  339 NLRB 1048 (2003) .....................................................48, 49

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
  550 U.S. 618 (2007) ................................................................44

*LeMoyne-Owen Coll. v. NLRB*,
  357 F.3d 55 (D.C. Cir. 2004) (Roberts, J.) ........................45, 57

*Lundy Packing Co.*,
  314 NLRB 1042 (1994) ..........................................................34

*Manufactured Hous. Inst. v. EPA*,
  467 F.3d 391 (4th Cir. 2006) ..................................................61

*Nestlé Ice Cream Co. v. NLRB*,
  46 F.3d 578 (6th Cir. 1995) ....................................................17

*New England Tel. Co.*,
  280 NLRB 162 (1986) ............................................................51

*Newton-Wellesley Hosp.*,
  250 NLRB 409 (1980) ............................................................50

*NLRB v. Action Automotive, Inc.*,
  469 U.S. 490 (1985) ................................................................40

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974) ................................................................58

*NLRB v. Enterprise Leasing Co.*
    (No. 12-1514) ........................................................................14

*NLRB v. Ky. River. Cmty. Care*,
    532 U.S. 706 (2001) ................................................................40

*NLRB v. Lundy Packing Co.*,
    68 F.3d 1577 (4th Cir. 1995) ........................................ *passim*

*NLRB v. Lundy Packing Co.*,
    81 F.3d 25 (4th Cir. 1996) ......................................................36

*NLRB v. Metro Ins. Co.*,
    380 U.S. 438 (1965) ................................................................39

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ..............................................9, 14, 15, 29

*Norrwock Shoe*,
    209 NLRB 843 (1974) ............................................................51

*Nueces Cnty. Navigation Dist. No 1 v. Interstate Commerce Comm'n*,
    674 F.2d 1055 (5th Cir. 1982) ................................................59

*P.S. Elliott Servs., Inc.*,
    300 NLRB 1161 (1990) ..........................................................51

*Park Manor Care Center*,
    305 NLRB 872 (1991) ......................................................37, 47

*Peterson/Puritan, Inc.*,
    240 NLRB 1051 (1979) ......................................................52, 53

*Pettibone Corp. v. United States*,
    34 F.3d 536 (7th Cir. 1994) ....................................................46

*Pfaff v. U.S. HUD*,
    88 F.3d 739 (9th Cir. 1996) ....................................................59

*Print-O-Stat, Inc.*,
    247 NLRB 272 (1980) ............................................................51

*Publix Super Mkts., Inc.*,
    343 NLRB 1023 (2004) ..........................................................51

*Purnell's Pride, Inc.*,
  265 NLRB 1190 (1982) .......................................................... 51

*Safeway Stores*,
  256 NLRB 918 (1981) ............................................................ 55

*Seaboard Marine, Ltd.*,
  327 NLRB 556 (1999) ............................................................ 51

*Sharpe v. Dir., Office of Workers' Comp. Programs*,
  495 F.3d 125 (4th Cir. 2007) ................................................. 32

*Smith v. Scott*,
  223 F.3d 1191 (10th Cir. 2000) ............................................. 46

*Specialty Healthcare & Rehabilitation Center of Mobile*,
  357 NLRB No. 83 (2011) ................................................ *passim*

*TDK Ferrites Corp.*,
  342 NLRB 1006 (2004) .......................................................... 54

*Transerv Sys., Inc.*,
  311 NLRB 766 (1993) ............................................................ 51

*U.S. Stamping Co.*,
  1 NLRB 123 (1936) ................................................................ 43

*United Foods, Inc.*,
  174 NLRB 91 (1969) .............................................................. 51

*United States v. Diaz*,
  245 F.3d 294 (3d Cir. 2001) .................................................. 46

*United States v. Flemming*,
  617 F.3d 252 (3d Cir. 2010) .................................................. 56

*United States v. Munn*,
  595 F.3d 183 (4th Cir. 2010) ................................................. 56

*Wellman Indus., Inc. v. NLRB*,
  490 F.2d 427 (4th Cir. 1974) ................................... 12, 28, 29

**Statutes**

5 U.S.C. § 553 ................................................................................ 61

29 U.S.C. § 157 .............................................................................. 44

29 U.S.C. § 159(b) .................................................................. 44, 55

29 U.S.C. § 159(c)(5) ........................................................................... *passim*

29 U.S.C. § 160(a) ........................................................................... 9

29 U.S.C. § 160(e) ........................................................................... 10

29 U.S.C. § 160(f) ........................................................................... 9

## JURISDICTIONAL STATEMENT

This case was previously before this Court. In Case No. 12-1684, Dreyer's petitioned for review of the a May 18, 2012 Order of the National Labor Relations Board ("Board"), and in Case No. 12-1783, the Board cross-petitioned for enforcement of its May 18, 2012 Order. On July 29, 2014, this Court vacated the Board's Order and remanded the case to the Board for further consideration in light of the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).

This case is currently before the Court on a petition for review and a cross-petition for enforcement of a final order of the Board, which determined that Dreyer's had committed an unfair labor practice by refusing to bargain with the International Union of Operating Engineers Local 501, AFL-CIO (the "Union"). The Board had jurisdiction over that proceeding under 29 U.S.C. § 160(a). The Board issued its final order disposing of all claims on November 5, 2014. Dreyer's filed this petition on November 7, 2014. The Board filed its cross-petition on December 9, 2014.

This Court has jurisdiction over this petition under 29 U.S.C. § 160(f), which provides for jurisdiction over petitions for review of final orders of the Board brought by any aggrieved party in any United States Court of Appeals where

the aggrieved party resides or transacts business.  Dreyer's owns and operates a production facility in Laurel, Maryland.

This Court has jurisdiction over the Board's cross-petition for enforcement under 29 U.S.C. § 160(e), which provides for jurisdiction over petitions for enforcement brought by the Board in any United States Court of Appeals where the aggrieved party resides or transacts business.

## STATEMENT OF THE ISSUES

1. Whether the "overwhelming-community-of-interest" test applied by the Board in determining that the Union's petitioned-for unit was appropriate improperly gave controlling weight to the extent of union organization, in contravention of Section 9(c)(5) of the National Labor Relations Act.

2. Whether the Board's adoption of the "overwhelming-community-of-interest" test represents a departure from historical Board precedent without a reasoned explanation.

3. Whether the Board's adoption of the "overwhelming-community-of-interest" in a case where the standard was not at issue exceeded the Board's authority and failed to comply with the rulemaking provisions of the Administrative Procedure Act.

4. Whether the Board's decision to approve a bargaining unit that excluded employees who shared a strong community of interest with bargaining-unit employees was contrary to the law of this circuit.

## STATEMENT OF THE CASE

This case arises out of a representation petition filed by the Union
with the Board on October 13, 2011.  The Union sought to represent only the
approximately 113 maintenance employees at the Dreyer's plant in Bakersfield,
California, despite having previously unsuccessfully pursued representation of a
unit including both maintenance and production employees.  Dreyer's objected to
the Union's proposed bargaining unit on the grounds that any unit including the
facility's maintenance employees should also include the production employees,
given the community of interests shared by the two sets of workers.

The Union and Dreyer's participated in a representation hearing
before a Board Hearing Officer on October 27 and 28, 2011, where Dreyer's
introduced testimony from three witnesses, while the Union introduced no
witnesses.  Following post-hearing briefing, the Board's Regional Director issued a
decision on November 23, 2011, directing an election in the Union's proposed
maintenance-only unit.  The Board denied Dreyer's petition for review of the
Regional Director's decision on December 28, 2011.  The maintenance employees
voted 56-53 in favor of unionizing on January 6, 2012.

Board decisions in representation cases are not considered reviewable
final orders.  *See, e.g.*, *Wellman Indus., Inc. v. NLRB*, 490 F.2d 427, 430 (4th Cir.
1974).  The only way to have a court review the Board's decision is to "test

certification" by refusing to bargain with the Union and triggering an unfair labor practice charge. Dreyer's did just that. It sent a letter to the Union on January 17, 2012 that informed the Union of Dreyer's refusal to bargain and explained the reason for the refusal.

Meanwhile, during the course of these proceedings, the Board's membership changed significantly. Through 2011, while the representation proceedings were ongoing, three of the five Board seats were filled. Those three members constituted the panel that denied Dreyer's initial petition for review in the representation proceeding on December 28, 2011. On January 3, 2012, however, Member Craig Becker's recess appointment ended. As a result, the Board was poised to lose its quorum. In response, President Obama purported to fill the Board's three vacancies using his recess appointment power on January 4, 2012. The Senate, however, held sessions on January 3 and 6, 2012, with the intent of preventing a recess from occurring.

The Union filed an unfair labor practice charge with the Board on February 9, 2012, based on Dreyer's refusal to bargain with the Union. On May 18, 2012, the Board granted summary judgment and determined that Dreyer's violated § 8(a)(3) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(3). One of the members of the Board panel that granted summary

judgment, Richard F. Griffin, had joined the Board on January 4, 2012 via a purported recess appointment.[1]

Dreyer's petitioned this Court for review of the Board's decision on May 23, 2012. The Board cross-petitioned for enforcement of its order on June 22, 2012. In addition to its challenges to the scope of the bargaining unit certified by the Board, Dreyer's also challenged constitutionality of the Board's May 18, 2012 summary judgment order on the grounds that the Board had no quorum because the purported recess appointments were unconstitutional.

On April 3, 2013, this Court placed this case in abeyance pending the Court's decisions in two other cases addressing the constitutionality of the recess appointments, *Huntington Ingalls, Inc. v. NLRB* (No. 12-2000), and *NLRB v. Enterprise Leasing Co.* (No. 12-1514). On July 17, 2013, this Court held in *Huntington Ingalls* and *Enterprise Leasing* that the recess appointments were unconstitutional. 722 F.3d 609, 660 (4th Cir. 2013).

On January 13, 2014, this Court placed this case in abeyance pending the Supreme Court's decision in *NLRB v. Noel Canning*, in which the Supreme Court was poised to address the constitutionality of the recess appointments. On

---

[1] Member Griffin did not recuse himself from this case despite having been the International Union's General Counsel until his appointment to the Board. *See* President Obama Announces Recess Appointments to Key Administration Posts (Jan. 4, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/01/04/president-obama-announces-recess-appointments-key-administration-posts.

June 26, 2014, the Supreme Court unanimously held that the appointments were unconstitutional.  134 S. Ct. 2550, 2578 (2014) ("[W]e conclude that the Recess Appointments Clause does not give the President the constitutional authority to make the appointments here at issue.").

Following the *Noel Canning* decision, the Board moved this Court to vacate its order and remand the case for further proceedings.  Dreyer's did not oppose this motion, and the Court granted it on July 29, 2014.  On remand, the Board again granted summary judgment against Dreyer's, ruling that Dreyer's failure to bargain with the Union was an unfair labor practice.  Dreyer's timely petitioned for review of the Board's November 5, 2014 Order on November 7, 2014.  The Board cross-petitioned for enforcement of its order on December 9, 2014.

## STATEMENT OF FACTS

### I.    THE FACILITY AND ITS HISTORY

Dreyer's operates a production facility in Bakersfield, California known as the Bakersfield Operations Center ("BOC").  (A-12[2])  At the BOC, Dreyer's manufactures ice cream products mainly for sale to individual consumers.  (A-14)  These products fall into one of two types, or "segments"—"packaged" ice cream products such as 48-ounce containers sold in many grocery stores, and "snack" items generally consumed one at a time such as cones, bars and sandwiches.  (A-14)  At the time of the hearing in this case, Dreyer's employed roughly 113 maintenance employees and 578 production employees at the BOC.  (A-101)

Prior unions have sought to represent employees at the BOC on three separate occasions.  Each time, the petitioning union sought to represent a bargaining unit consisting of both production and maintenance employees.  In 1988, Carnation (which then operated the facility) recognized the Teamsters as the representative of the production, maintenance, and materials employees at the facility.  (A-159; A-356 (Hr'g Ex. 11))  But the Union (*i.e.*, the IUOE, Local 501)

---

[2] All record citations in this brief based on proceedings before the Board cite directly to the Appendix filed contemporaneously with this Brief.  The appendix is paginated as "A-__."  Citations to this Court's docket are cited as "Dkt. __."

objected to the representation, and the Teamsters agreed to cease representing employees at the BOC. (A-165)

In 1991, the Teamsters and the Union jointly petitioned the Board to represent the production and maintenance employees at the BOC. (A-161; A-400 (Hr'g Ex. 13)). The employees voted in favor of unionizing, but the United States Court of Appeals invalidated the election on the grounds that the petitioning unions illegally conferred benefits on employees in advance of the election. *See Nestlé Ice Cream Co. v. NLRB*, 46 F.3d 578, 584 (6th Cir. 1995).

Finally, in 1999, the United Food and Commercial Workers ("UFCW") filed a petition seeking to represent a unit of production and maintenance employees. (A-163-164) The UFCW lost the election. (*Id.*) Thus three separate unions sought to represent a bargaining unit at the BOC, and each time the union(s) sought a unit that included, at a minimum, production and maintenance employees.

## II.    THE CURRENT PETITION

On October 13, 2011, the Union filed a representation petition with the Board, seeking to represent a bargaining unit consisting of a subset of the hourly employees at the BOC. (A-1) The unit sought by the Union included the maintenance employees but, unlike all previous attempts at unionization in the facility, excluded the production workers:

17

> **Included:** All full-time and regular part-time maintenance employees employed by the Employer at its facility located at 7301 District Boulevard, Bakersfield, CA.
>
> **Excluded:** All other employees, production employees, quality assurance employees, office and plant clerical employees, professional employees, persons employed by other employers, QA Receiving Coordinator, Microbiologist, Shipping Assistant, Input/Output Operator, Receiving Coordinator, Cycle Counter, Inventory Clerk, Accounting Specialist, Safety and Environment Technician H.R. Administrative Assistant, Maintenance Scheduler, guards and supervisors as defined in the Act, as amended.

(*Id.*) Dreyer's objected to the scope of this proposed unit. Dreyer's argued that any unit including the maintenance employees at the BOC necessarily needed to include, at a minimum, the production employees in the facility as well, given the strong community of interests shared by the two groups. (A-11)

## III.    THE REPRESENTATION HEARING

As a result of the disagreement between the Union and Dreyer's regarding the proper scope of the bargaining unit, the Board conducted a representation hearing before a hearing officer on October 27 and 28, 2011. At that hearing, Dreyer's introduced unrebutted evidence of the interests shared by the production and maintenance employees. That evidence showed that the two groups of employees worked closely together, frequently side by side. The evidence also showed that employees often worked together, shoulder to shoulder, in the production area, transferred from one group to the other with regularity, had

18

similar wages and identical benefits, were subject to the same workplace policies, shared the same changing and eating facilities and equipment, and were part of an effort to integrate the production process in the facility even further.

**A.    Working Conditions**

The production and maintenance employees work side-by-side at the BOC.  Maintenance employees are encouraged to perform work tasks outside of their job duties to help the production process.  (A-301)  Moreover, there is significant interchange among the two groups of employees, with production employees regularly transitioning into maintenance positions.  (A-155-156)

The line mechanics, which constitute about half of the Union's proposed bargaining unit, are each assigned to a particular business unit and spend the vast majority of their time working in the facility's production area, on the production line machines in their assigned unit.  (A-43)  They work directly with production employees to diagnose and repair problems with the production equipment for their unit.  (A-206-207)  When breakdowns arise, production employees assist the maintenance employees as needed, and Dreyer's expects the maintenance employees to communicate with the production employees throughout the process.  (A-59; A-225)  The production employees document the problem with input from the maintenance employees.  (A-226)

Beyond breakdowns, line mechanics and production employees also work together to fine-tune production equipment (A-210); to change the equipment and settings on the individual lines to accommodate the product to be produced (A-221); during shift start-up (A-205); during "pre-flight," the period immediately preceding start-up (A-209); during third-shift tear-down (*Id.*); during preventive maintenance days (A-240); and during autonomous maintenance days (A-255). Certain tasks required of the production employees require them to work with the maintenance employees on "every shift." (A-246)

Like the line mechanics, other maintenance employees also work closely with production employees. The twelve process technicians (maintenance employees) in the BOC work in the "pre-manufacturing" department with the production employees known as the "mix makers." (A-259; A-203) The process technicians work with the mix makers to perform sanitation maintenance (A-257); to troubleshoot the pre-production process (*Id.*); and to complete monthly audits required by state regulators (A-259). Again, each task requires close interaction between the two groups of employees, some of which can require the two groups to work together for an entire shift. (*Id.*) For example, during safety audits conducted by state inspectors, the process technicians and mix makers go through all of the equipment together to ensure that the equipment meets state standards, a process that can take up to eight hours. (*Id.*)

Though the production and maintenance employees have separate supervision, production supervisors are able to—and must, in some occasions—direct maintenance employees to perform repair work.  (A-56-57)  Moreover, at daily operations review meetings, production and maintenance supervisors raise issues with production and maintenance employees, and all employees discuss results from the prior day.  (A-58)  Further, plant management is integrated: all the production and maintenance employees report to the same plant manager.  (A-29)

There is also significant interchange between production and maintenance employees.  Nearly 50% of the 113 maintenance employees previously held production jobs in the BOC before transitioning into a maintenance role.  (A-155-156)  Maintenance employees are also free to move into production jobs; though less frequent, this has happened as well.  (A-175; A-195)

### B.    Wages and Benefits

Dreyer's also introduced unrebutted evidence that the production and maintenance employees shared similar wages and identical benefits.  Though the average maintenance employee is paid at a higher hourly wage than the average production employee, the wages of the two groups overlap.  (A-152-153)  Production employees working as "mix makers" have wage rates equivalent to those of entry-level maintenance employees.  (*Id.*)

Additionally, the two groups receive identical benefits. All of the following benefits are available equally to the production and maintenance employees alike, with identical eligibility requirements:

- Medical insurance benefits

- Dental insurance benefits

- Vision insurance benefits

- Flexible spending account

- Pension

- 401(k) retirement savings plan

- Education (tuition reimbursement) benefits

- Life Insurance

- Long-term disability pay

- Short-term disability pay

- Paid vacation

- Shift-differential pay

- Holiday pay[3]

- Approved Leaves of Absences

- Jury duty pay

- Funeral leave pay

---

[3] Because maintenance employees typically work a 10-hour shift, their holiday pay benefit is greater than that given to production employees, whose holiday pay benefit is calculated based on their typical 8-hour shift. (A-151) But the designated holidays are the same for each group, as is the formula used for the holiday pay benefit.

- Perfect attendance bonus

- Baby Nutrition coupons

- Paid time off for child bonding

- Various pay premiums for things like report-in pay and "cold" pay for work in the frozen warehouse

(A-150-151; A-181-183; A-329 (Hearing Ex. 9))

C.    **Terms of Employment**

In addition to working closely together within the identical workspace and receiving similar wages and benefits, production and maintenance employees at the BOC also have very similar terms of employment. They are subject to identical workplace policies, which include:

- An Equal Employment Opportunity policy

- An Anti-harassment policy

- A Controlled Substance (*i.e.,* drug and alcohol) policy

- An Attendance policy

- A Corrective Action (disciplinary) policy

- Various Leaves of Absence policies

- Various payroll practices and policies

- A "Use of Company Property" policy

(A-329)  These policies apply equally to hourly production and maintenance employees.  (A-148-150)[4]  Likewise, production and maintenance employees are subject to identical mandatory overtime policies: Both groups of employees are required to work overtime hours (A-188), and employees in both groups do so on a regular basis.  (A-184-185)  Both groups of employees are subject to being called in to work hours other than their regularly scheduled hours, and this happens to both maintenance and production employees alike.  (A-239-240)

Further, the payroll and review processes are identical for these hourly employees.  All are required to document their starting and ending work times by "punching" on either of the two time clocks located in the main employee entrance hallway.  (A-18; A-46)  Dreyer's pays all these employees the same way—paychecks are mailed to each employee every other Friday.  (A-182)  Additionally, Dreyer's evaluates each hourly employee's job performance on the same, annual basis.  (A-179-177)

Finally, the production and maintenance employees use the same facilities and wear similar uniforms.  Nearly all factory employees use the same employee parking lot and employee entrance.  (A-17-18)  All these hourly

---

[4] The only policy that has some different application to maintenance employees is the hours of work policy (maintenance employees typically work 10 hours per day, 4 days per week compared to production employees who typically work 8 hours per day, 5 days per week).  This would impact the number of paid "sick" leave hours and when daily overtime pay kicks in.  (A-146-148)

24

employees are entrusted with a security card that they use to swipe on an electronic reader to access the facility. (A-118-119) All use the same (gender-specific) locker rooms to change into the required work clothes supplied by Dreyer's. (A-18) All use one break room that contains vending machines and tables and seating to accommodate meals. (A-18) All wear similar blue uniforms supplied by Dreyer's, though the maintenance employees' uniforms are a darker shade of blue. (A-45) All production and maintenance employees alike are required to wear safety shoes, hearing protection, hair net, beard guard, hard hat, and safety glasses while in a production area at the BOC. (A-19; A-44-45)

### D.    Integration of Production and Maintenance Roles

Finally, before the petition was filed, Dreyer's had started a conscious effort to further integrate the production and maintenance employees at the BOC. Dreyer's provides tuition assistance benefits for technical education that production employees can obtain to qualify for maintenance jobs. (A-156) Also, the BOC is part of the Nestlé Continuous Excellence ("NCE") initiative. (A-62) NCE is a worldwide company program that focuses on driving continuous improvement in the efficiency of the operational side of Nestlé's business. (A-62) Part of the NCE plan at the Dreyer's facility was the process of "redefining tasks and responsibilities." (A-64-66) The primary goal of this redefinition is to shift the time allocation of production employees from a focus on "Operation" tasks

such as running equipment, to spending a majority of their time on "Autonomous Maintenance" tasks. (*Id.*; A-326) In sum, this requires the production employees to take on more and more of the tasks historically performed by maintenance mechanics, such as inspecting, lubricating and cleaning machine parts. (A-66)

Similarly, for maintenance employees, the goal of the NCE process is to have mechanics spend less of their time in the future on "Break down maintenance" tasks—those being shifted more and more to production employees—but more of their time than before on "Planned Maintenance" and "Training"—namely, training of the production employees on the routine maintenance tasks. (A-66; A-326)

The pilot project for NCE started in 2010 but had to be shelved due to high employee turnover. (A-69-70) But the project was reinitiated with the anticipation that it would be complete by 2012 and implemented across the production lines at the BOC. (A-69) In anticipation of this expansion, maintenance and production employees jointly created a comprehensive set of "Standard Operation Procedures" for the BOC. (A-67) Moreover, the maintenance department training coordinator now extends much of the maintenance department's training sessions to production employees, as well. (A-223-224)

In sum, Dreyer's introduced unrebutted evidence at the representation hearing that the production and maintenance employees at the BOC work closely together; enjoy identical benefits and similar wages; are subject to the same terms of employment; and are part of an particular business strategy and initiative to bring the two groups even closer together.

## IV.    REGIONAL DIRECTOR AND BOARD DECISIONS

Despite the evidence introduced at the representation hearing, the Board's Regional Director issued a Decision and Direction of Election on November 23, 2011 that approved the maintenance-only bargaining unit requested by the Union.  (A-402)  In his decision, the Regional Director relied heavily on *Specialty Healthcare & Rehabilitation Center of Mobile*, 357 NLRB No. 83 (2011), a decision issued by the Board three months earlier.  (A-15-16; A-21-22) The Regional Director cited *Specialty Healthcare* for the proposition that Dreyer's was required to show that the production and maintenance employees shared an "overwhelming community of interest" in order to include the production employees in any proposed unit.  (A-21-22)  The Regional Director concluded that while Dreyer's might have shown that a unit containing both production and maintenance employees was appropriate, it failed to meet the "heightened showing" under *Specialty Healthcare*.  (*Id.*)

Dreyer's requested review of the Regional Director's Decision and Direction of Election, which the Board denied in an unpublished opinion on December 28, 2011. (A-426) The Board order stated only that Dreyer's decision was denied because "it raises no substantial issues warranting review." (*Id.*)

## V.    UNFAIR LABOR PRACTICE PROCEEDINGS

Following the representation proceedings, an election of the maintenance employees was conducted. The employees voted in favor of joining the Union 56-53. (A-428) Because the Board's order in the representation proceeding was unreviewable, Dreyer's was required to refuse to bargain with the Union, thereby inviting the Union to file an unfair labor practice charge with the Board. *See Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 411 (1940); *Wellman Indus., Inc. v. NLRB*, 490 F.2d 427, 430 (4th Cir. 1974) ("[I]n order to challenge the union's certification the employer must refuse to bargain, triggering unfair labor practice proceedings under Section 8(a)(5)."). Dreyer's informed the Union of its position on January 17, 2012, and the Union filed an unfair labor practice charge with the Board on February 9, 2012. (A-427)

Dreyer's requested that the Board stay its decision in the unfair labor practice case due to the Board's lack of quorum. (A-428) A Board panel that included recent "recess" appointee Richard F. Griffin denied Dreyer's request and granted summary judgment on May 18, 2012. (*Id.*) The Board relegated Dreyer's

quorum argument to a footnote, rejecting it on the ground that it had earlier rejected a similar argument in a similar case. (*Id.*, n.1)

Dreyer's petitioned this Court for review of the Board's decision on May 23, 2012. The Board cross-petitioned for enforcement of its order on June 22, 2012. On July 29, 2014, this Court vacated the Board's May 18, 2012 Order and remanded the case to the Board for further proceedings in light of the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), which held that the purported recess appointments were unconstitutional.

On November 5, 2014, the Board again ruled that that Dreyer's committed an unfair labor practice by refusing to bargain with the Union.[5] Dreyer's petitioned this Court for review of the Board's Order on November 7, 2014.

---

[5] As far as Dreyer's is aware, the Board has reaffirmed itself in every remanded case that it has reconsidered in light of *Noel Canning*.

## SUMMARY OF ARGUMENT

The legal standard applied by the Regional Director and approved by the Board in determining that a maintenance-employee-only unit was appropriate was directly contrary to the Act.  As this Court has previously held, the "overwhelming-community-of-interest" test effectively makes the extent of union organization controlling, in direct contravention of § 9(c)(5) of the National Labor Relations Act.  *NLRB v. Lundy Packing Co.*, 68 F.3d 1577, 1581-82 (4th Cir. 1995).

Additionally, the test is unsupported by prior Board precedent and is a departure from precedent without reasoned analysis.  *Id.* at 1582.  While the Board has the discretion to depart from its prior precedents, it has the obligation to acknowledge them and explain the shift. Here, the Board has not even acknowledged that *Specialty Healthcare* departed from fifty years of settled precedent, much less reasonably explained the reasons for such a departure. Accordingly, the decision as an abuse of discretion.

Further, the Board exceeded its authority under the Administrative Procedure Act by adopting a rule of general applicability in a case—*Specialty Healthcare*—where the rule was not even at issue.  To the extent that the Board wanted to avoid the detailed rulemaking requirements of the Administrative Procedure Act, it was incumbent on the Board to wait for a case with the correct

factual posture and legal arguments before doing so.  Additionally, to the extent that the Board asserts that its call for amicus briefs served a quasi-rulemaking function, the process did not satisfy the requirements of the Administrative Procedure Act.

Finally, the employees excluded from the bargaining unit by the Regional Director in this case are functionally identical to the employees that this Court found should necessarily be included in the voting unit in *Lundy*.  *Id.* at 1582-83.  Based on this precedent, the production employees must be included in any bargaining unit that also contains the maintenance employees.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Board's unit determination is reviewed for abuse of discretion. *Lundy*, 68 F.3d at 1579.  The application of the incorrect legal standard necessarily constitutes an abuse of discretion.  *Sharpe v. Dir., Office of Workers' Comp. Programs*, 495 F.3d 125, 134 (4th Cir. 2007).  Likewise, the Board abuses its discretion when it fails to support a departure from precedent with reasoned analysis.  *Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 874 (4th Cir. 1999) ("We consider a departure from established policy, absent a reasonable explanation, to be an abuse of discretion.").

### II.   THE BOARD'S ADOPTION OF THE OVERWHELMING-COMMUNITY-OF-INTEREST TEST VIOLATES THE NATIONAL LABOR RELATIONS ACT.

The Board's decision in this case violates the National Labor Relations Act.  The Regional Director's Decision and Direction of Election applied the framework established by the Board's recent decision in *Specialty Healthcare & Rehabilitation Center of Mobile*, 357 NLRB No. 83 (2011).  In *Specialty Healthcare*, the Board concluded that a union's petitioned-for unit will be appropriate unless the employer proves that employees excluded from the unit share "an overwhelming community of interest" with the employees in the proposed unit.  *Id.* at 12-13.  Unless this "overwhelming" standard is met, the proposed unit will be deemed appropriate, as long as the employees in the

proposed unit share a minimal set of interests. *Id.* at 12. The Regional Director applied this test and concluded that Dreyer's failed to meet this burden. (A-420-421)

*Specialty Healthcare* represents the Board's second attempt to implement its so-called "overwhelming-community-of-interest" test when determining whether a petitioned-for unit (*i.e.*, the particular bargaining unit sought by a union) is appropriate. The first time that the Board tried to implement this test, twenty years ago, this Court decisively rejected it. In *NLRB v. Lundy Packing Co.*, 68 F.3d 1577 (4th Cir. 1995), this Court recognized that the Board's attempt to put such a thumb on the scales in favor of a union's petitioned-for bargaining unit (1) violated the express command of the Act by giving controlling weight to the extent of union organization; and (2) represented a wholesale reversal of decades of Board precedent on the determination of appropriate units without a reasoned explanation. Nothing has changed in the twenty years since *Lundy* that would render the "overwhelming-community-of-interest" test lawful. Given the unlawful legal standard applied by the Board in this case, this Court cannot enforce the Board's order.

A.    *Lundy Packing*.

In *Lundy*, two unions sought to represent a unit of production-and-maintenance employees in an employer's facility.[6]  The employer argued that the unions' proposed unit was too narrow and that only a wall-to-wall unit of all the eligible employees in the facility would be appropriate.  Specifically, the employer sought to add, among other workers, electricians, quality control employees, industrial engineers, and lab technicians to the unit.  The Board ultimately determined that the union's proposed unit, after some additions by the Regional Director, was appropriate.  In reaching its conclusion, the Board determined that the excluded employees at issue "do not share such an *overwhelming community of interest* with the petitioned-for production and maintenance employees as to mandate their inclusion in the unit."  *Lundy Packing Co.*, 314 NLRB 1042, 1043 (1994) (emphasis added).   The decision provoked a sharp dissent, which took issue with the adoption and application of the "overwhelming" test.  *See id.* at 1046 (Member Stephens, dissenting).  The dissent noted that Board precedent did not support the use of the "overwhelming" test and that the new test "derogated the Board's policy against fragmenting production and maintenance units."  *Id.*

---

[6] Note that the unit proposed by the *petitioning unions* in *Lundy* was broader than the unit *Dreyer's* has requested here.  In other words, the Union's proposed unit in this case is *even narrower* than the unit deemed too narrow in *Lundy*.

This Court denied the Board's petition for enforcement of its order, holding that the Board "both contravened its own announced standards and accorded controlling weight to the extent of union organization at Lundy, thereby violating § 9(c)(5) of the National Labor Relations Act." *Lundy*, 68 F.3d at 1579. The Court began by noting that the "composition of a bargaining unit is significant." *Id.* Though unit determination is a matter for the Board's discretion, "[n]onetheless the Board must operate within statutory parameters." *Id.* at 1580. One of those parameters is that the Board cannot allow the extent of union organization to be the controlling or "dominant" factor in making the unit determination. *Id.* By presuming that the union-proposed unit is appropriate absent an "overwhelming community of interest" with excluded employees, the Board violated this rule. *Id.* at 1581. Given that "the union will propose the unit it has organized," the presumption that the union's unit is appropriate gives the organized unit de facto controlling weight, in violation of § 9(c)(5) of the Act. *Id.* Moreover, by adopting the "overwhelming" standard without providing a reasoned explanation for doing so, its decision was not entitled to deference. *Id.* at 1583 ("While the Board may choose to depart from established policy, it must explicitly announce the change and its reasons for the change." (internal quotation marks omitted)). As the Court concluded: "The deference owed the Board as the primary

guardian of the bargaining process is well established. It will not extend, however, to the point where the boundaries of the Act are plainly breached." *Id.*

Rather than remand the case to the Board, this Court simply denied enforcement of the Board's order and terminated the case. *Id.*; *see also NLRB v. Lundy Packing Co.*, 81 F.3d 25, 26-27 (4th Cir. 1996) (rejecting Board's attempt to reinstate proceedings following court's initial decision and "reiterat[ing] our earlier order that enforcement of the Board's bargaining order is denied and that this case is closed in all respects.").

### B.  *Specialty Healthcare.*

In *Specialty Healthcare*, a union petitioned the Board to represent a unit of certified nursing assistants (CNAs) in a non-acute care nursing home. 357 NLRB No. 83, at 1. The employer argued that the unit should also include the other service and maintenance employees in the facility. *Id.* at 3. The issue in the case turned on the particular rules applied to the health-care industry. Despite the narrow issue presented in the case and the unique rules applied to health-care facilities, the Board took the opportunity to rewrite the entire body of labor law on the appropriateness of bargaining units. Though neither party had asked the Board to address issues beyond the scope of the facts of the case, the Board majority decided to do just that, ordering the parties and inviting amici to address eight different questions regarding the appropriate scope of a bargaining unit. *Id.* at 1.

As relevant here, the Board asked the parties to address issues of general

application outside the health-care context, including:

> Where there is no history of collective bargaining, should the Board hold that a unit of all employees performing the same job at a single facility is presumptively appropriate in nonacute health care facilities. Should such a unit be presumptively appropriate as a general matter. . . .
>
> Should the Board find a proposed unit appropriate if, as found in *American Cyanamid Co.*, 131 NLRB 909, 910 (1961), the employees in the proposed unit are "readily identifiable as a group whose similarity of function and skills create a community of interest."

*Id.*

The Board's holding in *Specialty Healthcare* was divided in two parts.

First, it overruled its prior decision in *Park Manor Care Center*, 305 NLRB 872

(1991), which had created a pragmatic community of interest tests to determine

whether a proposed unit is appropriate in non-acute health care facilities. 357

NLRB No. 83 at 4-8. The Board purported to "return to traditional community-of-

interest considerations in determining if a proposed unit is an appropriate unit in

nonacute health care facilities." *Id.* at 8. By its very terms, this holding was

limited to the non-acute health care industry.

The Board's second holding, however, dramatically reshaped the law

on appropriate bargaining units across all industries. Purporting to "make clear"

the law, *see id.* at 12, the Board actually created a completely new test to determine

when a proposed unit is appropriate.  According to the Board, the analysis begins by looking solely at the unit proposed by the union and not considering any employees outside that unit.  *Id.*  "If that unit is an appropriate unit, the Board proceeds no further."  *Id.*  A unit is appropriate if the employees share a "community of interest."  *Id.* at 9.  If that low standard is met, the analysis concludes unless the employer argues that "a proposed unit consisting of employees readily identifiable as a group who share a community of interest is nevertheless *not* an appropriate unit because the smallest appropriate unit contains additional employees."  *Id.* at 10 (emphasis in original).  In that case, the employer is required to make "a showing that the included and excluded employees share an *overwhelming community of interest*."  *Id.* at 11 (emphasis added).  The only example given by the Board of employees who share an "overwhelming" community of interest are two employees with the same title; a bargaining unit including one of the employees but excluding the other would be an inappropriate fractured unit.  *Id.* at 13.  Member Hayes dissented from the Board's order, arguing that the "decision fundamentally changes the standard for determining whether a petitioned-for unit is appropriate in any industry subject to the Board's jurisdiction."  *Id.* at 15 (Member Hayes, dissenting).

   *Specialty Healthcare* was enforced by the Sixth Circuit Court of Appeals under the name *Kindred Nursing Centers East, LLC v. NLRB*, 727 F.3d

552 (6th Cir. 2013). But despite the fact that both parties and *amici* on both sides cited *Lundy Packing* in their respective briefs, the Sixth Circuit completely ignored the case. The opinion did not even discuss *Lundy Packing*, much less try to distinguish it. The employer did not petition the Supreme Court for a writ of certiorari.

### C.      The Overwhelming-Community-of-Interest Test Violates the National Labor Relations Act by Giving Controlling Weight to the Extent of Union Organization.

Just as in *Lundy*, an explicit proscription in the Act was plainly ignored here. The Act provides that "[i]n determining whether a unit is appropriate for the purposes [of collective bargaining,] the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5) ("§ 9(c)(5)"). As the *Lundy* court noted, § 9(c)(5) was enacted as part of the Taft-Hartley Act in 1947 in response to a perception that the Board was abdicating its responsibility under the Act by choosing units supported on the basis of extent of organization. 68 F.3d at 1580. Prior to Taft-Hartley, the Board regularly issued "decisions where the unit determined could only be supported on the basis of the extent of organization." *NLRB v. Metro Ins. Co.*, 380 U.S. 438, 441 (1965). As a result, Congress amended the law so that the Board could consider "the extent of organization" as just one factor among many when determining whether a proposed unit was appropriate. *Id.* at 442.

Through the Taft-Hartley Act, Congress confirmed that the Board was to protect employees' free choice about whether to allow a union in to their workplace, and not merely be a partisan champion of unions (or of employers for that matter). For example, Taft-Hartley "emphasized that employees 'have the right to refrain from any or all' § 7 activities," (i.e., the right to join a union or engage in concerted activity) in addition to the right to engage in such activities. *See Chamber of Commerce v. Brown*, 554 U.S. 60, 67 (2008) (quoting 29 U.S.C. § 157). In other words, Taft-Hartley "provided equal protection for the employee's right *not* to join a union as for the right to support a union." *NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 500 (1985) (Stevens, J., dissenting) (emphasis in original). Likewise, Taft-Hartley "added § 8(b), which prohibits unfair labor practices by unions," *Brown*, 554 U.S. at 67 (citing 29 U.S.C. § 158(b)), made it unlawful for supervisors to organize and support unions, *NLRB v. Ky. River. Cmty. Care*, 532 U.S. 706, 718 (2001), and prohibited "closed shop" agreements requiring employers to hire only union members, *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 747-49 (1993). It is against this backdrop that the meaning of § 9(c)(5) must be considered.

To deal with the limitations imposed by §9(c)(5), the Board developed the "community of interest" test. *Lundy*, 68 F.3d at 1580. Under that test, the Board would review "[s]everal criteria, *no one of which was more dominant than*

*another* [in order to] determine whether employees shared a community of interest sufficient to form an appropriate unit." *Id.* (emphasis added). By examining twelve separate factors bearing on the unit determination decision, the Board ensured that the extent of organization would not be the controlling factor. *Id.*

Under §9(c)(5), the Board cannot use extent of organization as either the exclusive, controlling, or dominant factor in determining the appropriateness of a unit. *Lundy Packing*, 68 F.3d at 1580; *Arcadian Shores, Inc. v. NLRB*, 580 F.2d 118, 120 (4th Cir. 1978). This Court has already held that the overwhelming-community-of-interest test violates § 9(c)(5) of the Act by "accord[ing] controlling weight to the extent of union organization." *See Lundy Packing*, 68 F.3d at 1581.

The "overwhelming" test turns the traditional community of interest test on its head. Instead of using a range of factors to determine whether a proposed unit is appropriate, as the Board did with its traditional test, the overwhelming test skews the analysis "overwhelmingly" in favor of the union-proposed unit, to the detriment of the preferences of the other employees. Instead of considering twelve factors, "no one of which [is] more dominant than another," *id.* at 1580, the Board begins by considering only one factor: extent of organization. As long as the petitioning union is savvy enough not to petition for a manifestly fractured unit (*i.e.*, a unit including some employees with a particular title but excluding other employees with that same title), the unit requested will be

deemed appropriate. This was the concern identified in *Lundy*, and the Board's renewed attempt to adopt this standard does nothing to assuage that concern.[7]

To be sure, the Board argues that its new "overwhelming community of interest" test is "vastly and crucially different" than its old "overwhelming community of interest" test. *Specialty Healthcare*, 357 NLRB No. 83, at 11 n.25. This claim cannot be sustained. To reach this conclusion, the Board first contorts its *Lundy* decision and then contorts this Court's rejection of *Lundy*. First, the Board claims that *Specialty Healthcare* is different than *Lundy* because the "new" standard requires a showing that "employees in the petitioned-for unit must be readily identifiable as a group and the Board must find that they share a community of interest using the traditional criteria before the Board applies the overwhelming-community-of-interest standard to the proposed larger group." *Id.* According to the Board, it was the lack of this initial factual finding in *Lundy* that led this Court to reject it. *Id.* (claiming that the Board's decision in *Lundy* "had applied the correct legal standard . . . but had not first made the necessary findings" to support that standard).

---

[7] Indeed, in this case the Board showed an even greater deference to the extent of union organization than the *Lundy* Board did. In *Lundy*, the Regional Director amended the petitioning unions' proposed unit by adding employees not included in the petition. *Id.* at 1579. Here, on the other hand, the Regional Director approved the Union's proposed unit exactly as requested. (A-252)

This is demonstrably false.  The "necessary findings" that the Board says were missing in *Lundy* were present on the face of the facts of the case. Production-and-maintenance units, like the one sought in *Lundy*, were "readily identifiable" on their face and shared a "community of interest" based on the Board's longstanding precedent.  Indeed, the Board's history of recognizing production-and-maintenance units in manufacturing facilities goes back to its earliest days of the Board.  *See U.S. Stamping Co.*, 1 NLRB 123, 128 (1936).[8]

Similarly, there is zero indication in this Court's *Lundy* decision that it turned on the absence of some threshold factual finding.  Nowhere in the opinion does this Court suggest that its concern was that the production-and-maintenance unit proposed in that case was not "readily identifiable" or lacked a "community of interest."  To the contrary, the Court was clear that the problem with the "overwhelming" test is that it relied too heavily on the unit proposed by the union, in direct violation of the careful balancing Congress established in § 9(c)(5). *Lundy*, 68 F.3d at 1581.

Thus, the Board's attempts to distinguish the test applied in *Specialty Healthcare* from the test rejected by this Court in *Lundy* are unpersuasive.  The Board's interpretation of a judicial decision is not entitled to any deference.

---

[8] This was just the eighth decision ever issued by the Board.

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 n.11 (2007).

This Court need not – and should not – accept the Board's claim that *Specialty Healthcare* solved the problems with the "overwhelming" test identified by this Court in *Lundy*. The Board's application of the overwhelming-community-of-interest test so skewed the analysis in favor of the Union's petitioned-for unit that it made the extent of organization the controlling or dominant factor in its decision. Doing so violated § 9(c)(5) of the Act.[9]

## III.  THE BOARD FAILED TO PROVIDE A REASONED EXPLANATION FOR ITS DEPARTURE FROM PRIOR BOARD DECISIONS WHEN ADOPTING THE OVERWHELMING-COMMUNITY-OF-INTEREST TEST.

In addition to giving controlling weight to the extent of union organization, the Board's overwhelming-community-of-interest test is fatally flawed for other reasons as well. Key among them is the Board's failure to provide a reasoned explanation for its adoption of the "overwhelming" test and the inevitable repudiation of more than forty years of precedent that flowed from the new test. Far from providing a reasoned explanation for its decision, the Board

---

[9] In addition, the Board's decision in *Specialty Healthcare* abdicated its responsibilities under § 9(b) of the Act, which provides that "[t]he Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising *the rights guaranteed by this subchapter*, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." 29 U.S.C. § 159(b) (emphasis added). One of those rights, enshrined since 1947, is the right to refrain from collective bargaining and union organization. 29 U.S.C. § 157. By crediting so heavily the petitioned-for unit, the Board's decision effectively denies the rights of those who would choose to refrain from collective bargaining.

fails to even acknowledge that *Specialty Healthcare* changed the law, instead insisting that it merely clarified the law. This is false.

## A. An Agency Is Required to Provide a Reasoned Explanation to Support a Departure from Prior Precedent.

Where an agency, including the Board, repudiates its prior law, it needs to provide a reasoned explanation for doing so. *J.P. Stevens & Co., Inc. v. NLRB*, 623 F.2d 322, 329 (4th Cir. 1980) ("The Board may change its policies. Indeed, it has a duty to alter them to respond to new circumstances. When it deviates from its precedents, however, it must make a reasoned explanation for the change."); *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 60 (D.C. Cir. 2004) (Roberts, J.); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). Without an explanation, a court has no way to determine why the agency departed from its prior holding and, therefore, whether the agency exercised its discretion properly. *LeMoyne-Owen*, 357 F.3d at 61; *see also Lundy*, 68 F.3d at 1583 ("While the Board may choose to depart from established policy, it must explicitly announce the change and its reasons for the change." (internal quotation marks omitted)). The purpose of the reasoned explanation requirement is "so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,

412 U.S. 800, 808 (1973) (plurality opinion).  Courts are entitled—indeed,

required—to test the adequacy of an agency's justification for changing its policy.

Where the justification is found lacking, the decision must be rejected.  *See, e.g.*,

*Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 876 (4th

Cir. 1999) ("[I]t is well settled that this Court will not accept the Board's departure

from its standing interpretation of the Act without a reasonable explanation.").

>    **B.    The Court Need Not Defer to the Board's Claim that its Decision
>    Clarified the Law, Rather than Changed the Law.**

No deference is owed to the Board's claim that it was simply

"clarifying" the law when it created the "overwhelming-community-of-interest"

test.  This Court is competent to determine whether a rule articulated by the Board

is consistent with prior precedent—just as it is competent to determine whether a

rule articulated by a district court is consistent with precedent.  Just as no deference

is owed to the district court on such a pure question of law, no deference is owed to

the Board on the issue of whether its decisions change prior law.  *See, e.g.*, *United

States v. Diaz*, 245 F.3d 294, 304 (3d Cir. 2001) ("The mere fact that an

amendment is referred to as a clarification or a revision is ordinarily of slight

import to our analysis. Rather, it is our own interpretation . . . that determines

whether the Amendment clarified that interpretation or substantively changed it."

(quotation marks and punctuation omitted)); *Smith v. Scott*, 223 F.3d 1191 (10th

Cir. 2000); *Pettibone Corp. v. United States*, 34 F.3d 536, 542 (7th Cir. 1994) ("In

1994 the IRS changed its view. We do not accept its assertion that the 1994 version

merely restates and clarifies the 'real' meaning of the older regulation."); *Detroit*

*Edison Co. v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974).  In each of these cases, the

court disregarded an agency determination that an amendment was a clarification

and determined the issue for itself.  Here, too, the Court need not simply take the

Board at its word that *Specialty Healthcare* merely clarified the law.

Moreover, there was disagreement among the Board members

regarding whether the "overwhelming" standard is merely a clarification or an

entirely new standard.  *See Specialty Healthcare*, 357 NLRB No. 83 (2011), at 15

(Hayes, dissenting) ("[T]oday's decision fundamentally changes the standard for

determining whether a petitioned-for unit is appropriate in any industry subject to

the Board's jurisdiction."); *id.* at 18 ("The majority purports to apply 'traditional

community-of-interest' principles in making unit determinations for nonacute

health care facilities. However, their definition of these principles is far from

traditional and will have the intended dramatically different results in appropriate

unit determinations for all industries.").  Thus, no deference is owed to the Board's

determination that the *Specialty Healthcare* rule is a mere clarification.

## C. *Specialty Healthcare* Changed Board Law on Unit Determinations.

The Board undoubtedly explained its decision to overrule *Park Manor*

and adopt a new standard for unit determination in the health care industry.

Whatever the merits of that decision, the Board's opinion gives courts a fair

opportunity to review it and understand the Board's rationale. The same cannot be

said for the adoption of the "overwhelming" test. The Board argues that it is

merely clarifying the law, rather than changing it. If this claim is false, by

definition the Board has failed to reasonably and adequately explain the change.

1. *The Board's Support for its Prior Use of the "Overwhelming" Test in* Specialty Healthcare *Is Almost Non-Existent.*

In *Specialty Healthcare*, the Board began by acknowledging that

"different words have been used to describe" the employer's burden to show that a

proposed unit is too small. 357 NLRB No. 83, at 11. The Board then cited all the

case law it could muster in support of the "overwhelming" test. It was able to cite

just two cases over the previous twenty years that used the phrase "overwhelming

community of interest" outside of the accretion context. *Id.* One of those two

cases was *Lundy*, where the test was rejected and where this Court acknowledged

that the "overwhelming" test was an unsupported change in the law.

In the other case, it was *the employer*, not the Board, who argued that

a group of employees shared an overwhelming community of interest: "*the*

*employer* argued that the Lang-supplied carpenters and helpers shared such an

overwhelming community of interests with the solely-employed carpenters and

helpers that a unit excluding the former employees would be inappropriate."

*Laneco Constr. Sys., Inc.*, 339 NLRB 1048, 1049 (2003); *see also id.* at 1050

48

("[W]e reject *the Employer's argument* that the Lang-supplied carpenters and helpers shared such an overwhelming community of interests . . . ." (emphasis added)). Nowhere in *Laneco* does the Board endorse that standard or conclude that employers *must* show an "overwhelming" community of interest to defeat a proposed unit. Thus, there is zero basis for the Board to argue that the "overwhelming community of interest" had support in the law prior to *Specialty Healthcare*.

The Board's use of *Lundy* in *Specialty Healthcare* reveals the extent of the Board's faulty analysis and the impropriety of its new "overwhelming" test. On one hand, given the paucity of precedent using the "overwhelming" test that could justify the Board's claim that it is merely clarifying the law, the Board must have felt compelled to cite *Lundy*. On the other hand, recognizing that this Court denied enforcement in *Lundy*, the Board also must have felt compelled to distinguish *Lundy*. As noted above (*see* Section III.C., *supra*), the Board did so in forceful terms: "[T]he rule disapproved by the court in *Lundy* . . . is *vastly and crucially different* from the standard we apply here." *Id.* at 11 n.25 (emphasis added). But if the *Lundy* standard is "vastly and crucially different" from the *Specialty Healthcare* standard, query how can *Lundy* also be used as support for the proposition that "[t]he Board has articulated the *same standard*." *Id.* at 11. In one paragraph, the *Lundy* standard is both the "same standard" as the *Specialty*

49

*Healthcare* standard and "vastly and crucially different" than *Specialty Healthcare*.

Such superficiality and inconsistency alone justifies a determination that *Specialty Healthcare* lacks the reasoned analysis required to discard prior precedent.

> 2.   *The Mechanics of the Test Articulated in* Specialty Healthcare *Are Inconsistent with the Board's Prior Standard.*

Moreover, comparing the standard created in *Specialty Healthcare* to the standard used prior to the decision demonstrates the dramatic changes brought about by the "overwhelming" test. Prior to *Specialty Healthcare*, the Board's community-of-interest test involved a comparison between the petitioned-for employees and those outside the unit to determine whether the former group was "sufficiently distinct" to warrant separate bargaining. At no point under the traditional test did the Board look solely at the petitioned-for unit:

> *The Board's inquiry into the issue of appropriate units, even in a non-health care industrial setting, never addresses, solely and in isolation, the question whether the employees in the unit sought have interests in common with one another.* Numerous groups of employees fairly can be said to possess employment conditions or interests "in common." Our inquiry—though perhaps not articulated in every case—necessarily proceeds to a further determination whether the interests of the group sought are sufficiently distinct from those of other employees to warrant the establishment of a separate unit.

*Newton-Wellesley Hosp.*, 250 NLRB 409, 411 (1980) (emphasis added). This standard has been reaffirmed countless times in a nonpartisan manner by Boards of all political stripes. *See, e.g.*, *AGI Klearfold, LLC*, 350 NLRB 538, 541 (2007);

*Publix Super Mkts., Inc.*, 343 NLRB 1023, 1024 (2004); *Home Depot USA, Inc.*, 331 NLRB 1289, 1291 (2000); *Seaboard Marine, Ltd.*, 327 NLRB 556, 556 (1999); *C&K Mkt., Inc.*, 319 NLRB 724, 726 (1995); *Transerv Sys., Inc.*, 311 NLRB 766, 767 (1993); *P.S. Elliott Servs., Inc.*, 300 NLRB 1161, 1162 (1990); *New England Tel. Co.*, 280 NLRB 162, 164 (1986); *Barbara George, Inc.*, 273 NLRB 1239, 1240 (1984); *Purnell's Pride, Inc.*, 265 NLRB 1190, 1190 (1982); *Print-O-Stat, Inc.*, 247 NLRB 272, 273 (1980); *Atl. Richfield Co.*, 231 NLRB 31, 32 (1977); *Norrwock Shoe*, 209 NLRB 843, 843 (1974); *Harrah's Club*, 187 NLRB 810, 812-13 (1971); *United Foods, Inc.*, 174 NLRB 91, 91 (1969).

Thus, prior to *Specialty Healthcare*, it was settled law that the Board did not look solely at the petitioned-for unit when determining whether that unit was appropriate.  Yet, *Specialty Healthcare* mandates this precise test.  357 NLRB No. 83, at 8 ("Procedurally, the Board examines the petitioned-for unit first.  If that unit is an appropriate unit, the Board proceeds no further.").  The Board does not even acknowledge this line of cases, despite relying on it just one year earlier in *Wheeling Gaming* and despite the fact that the dissent called it out for the majority. *See id.* at 19 (Member Hayes, dissenting).  Its silence confirms its acknowledgment that there is no legitimate way to square its newly skewed test with precedent.

3.    *The* Specialty Healthcare *Test Is Inconsistent with Prior Results in Production-and-Maintenance Cases.*

Likewise, the Board's approach to manufacturing cases prior to the adoption of the *Specialty Healthcare* test establishes just how different the current standard is from the prior standard.  A long line of Board cases requires production-and-maintenance units even where a union seeks to represent only maintenance employees.  In those cases, the Board often acknowledged the considerable differences between production and maintenance employees in a particular workplace.  Despite the differences, the Board nevertheless has regularly held that requested maintenance-only units were inappropriate.  The Board's decisions in these cases, overlooking differences in two groups of employees and holding that separate units would be inappropriate, cannot be squared with the "overwhelming-community-of-interest" standard.  In other words, had these past cases been reviewed under the *Specialty Healthcare* standard, their outcomes would have been different.  As a result, the standard announced in *Specialty Healthcare* cannot be considered to be merely clarifying.

For example, in *Peterson/Puritan, Inc.*, 240 NLRB 1051 (1979), a union sought to represent a unit of mechanics.  In favor of this separate unit, the union pointed to several key distinctions between the production and maintenance employees:

The mechanics are paid a higher average wage than the production line employees, wear a distinct uniform, and report to work one-half hour before each production shift begins. Also, the mechanics are under the exclusive supervision of the line mechanics supervisor, who reports directly to the plant engineer.

*Id.* at 1051. Despite these differences, the Board concluded that a separate maintenance unit would be inappropriate. In doing so, the Board did not claim that the production and maintenance employees shared an "overwhelming community of interest." Rather, it made a much more modest finding: because "the mechanics work close to, and share common benefits with, production workers, perform duties which are an integral part of the production process, and do not possess a high level of skills, we find that a unit limited to line mechanics is inappropriate." *Id.*[10] These relatively modest similarities cannot support a conclusion that the two groups of employees shared an "overwhelming community of interest"; yet the Board nevertheless rejected the union's petition for a separate unit. *See also Buckhorn, Inc.*, 343 NLRB 201 (2004) (requiring combined production-and-maintenance unit despite higher wages, different skills, different departments, and different training for maintenance employees);[11] *TDK Ferrites Corp.*, 342 NLRB

---

[10] Here too, most of the maintenance workers are assigned to particular production lines and work side by side with particular production employees. (A-404-05.) And, they share virtually identical benefits. (A-150-151; A-181-183; A-329 (Hearing Ex. 9))

[11] The wage "gap" in *Buckhorn* is larger than the wage gap in this case. In *Buckhorn*, the maintenance employees earned between $12.25 and $18.25 per hour, while the production (Continued)

1006 (2004) (separate maintenance unit inappropriate despite maintenance employees having higher skill, higher average wage, and different training and aptitude requirements than production workers); *F&M Schaefer Brewing Co.*, 198 NLRB 323 (1972) (separate maintenance unit inappropriate despite higher wages, different job tasks, and different uniforms). In none of these cases did the Board require an overwhelming community of interest between the employees that the unions sought to exclude and the employees in the proposed unit, nor could the Board have made such a showing in light of the differences between the groups in each case.

In short, the outcomes of the Board's prior precedents are wildly inconsistent with the notion that employers must show an "overwhelming community of interest" between employees in a proposed unit and employees excluded from that unit. In those cases, much more modest findings were sufficient to require a larger unit than the union proposed. Because the Board's

---

employees earned between $10.25 and $12.75 per hour. *See id.* at 202 n.5. In the present case, the maintenance employees earned between $20.00 and $30.00 per hour, while the production employees earned between $15.00 and $22.00 per hour. (A-418.) In both cases, the maintenance employees earned a higher average wage, but there was an overlap in the two wage ranges. In the present case, the overlap was larger ($2.00 per hour here versus just $0.50 per hour in *Buckhorn*). Yet in *Buckhorn*, the Board relied on the overlap as evidence that a maintenance-only unit was inappropriate*, see id.*, while in the present case, the regional director dismissed the overlap. (A-418.)

new test would unquestionably lead to different outcomes in these cases, it cannot

be considered a mere clarification of the law.

    4.     *Prior to Specialty Healthcare, "Overwhelming Community of Interest" Was Relevant Only to Accretion Cases.*

As the *Lundy* court noted, the "overwhelming" test has been used in

the past, but in a completely different context. 68 F.3d at 1581. The test was

developed in "accretion" cases, where a party seeks to add employees to an already

existing bargaining unit without giving the potential new members an opportunity

to vote on whether or not to join the union. *See Safeway Stores*, 256 NLRB 918,

918 (1981) (accretion appropriate "when the additional employees share an

overwhelming community of interest with the preexisting unit to which they are

accredited"). In such cases, it makes sense to require a very strong showing of

similar interests, because certain employees are being denied the opportunity to

even vote on whether they should join a particular union. In order "to assure to

employees the fullest freedom in exercising" their rights under the Act, *see* 29

U.S.C. § 159(b), employees should be denied a vote only when they are virtually

identical to employees already in the bargaining unit, such that continuing to

exclude them is irrational or arbitrary. Requiring such a showing as a precondition

for the disenfranchisement of employees is entirely rational. It makes no sense,

however, to apply the same standard when what is being sought is the exact

opposite—the enfranchisement of employees. That a standard once reserved for

the narrow and unique circumstances of accretion has become the general standard in all unit petitions demonstrates that the Board is not clarifying—but rather rewriting—labor law.

5. *Because the Board Did Not Adequately Explain its Departure from Prior Precedent in Specialty Healthcare, its Decision Is an Abuse of Discretion.*

Finally, because *Specialty Healthcare* directly conflicts with *Lundy*, it cannot be considered a clarification: "an amendment that conflicts with circuit precedent is a substantive amendment, even if it is designed merely to elucidate the original intent" of the agency. *United States v. Munn*, 595 F.3d 183, 194 (4th Cir. 2010) (quotation marks omitted); *see also United States v. Flemming*, 617 F.3d 252, 268 (3d Cir. 2010) ("Generally, if an amended guideline and commentary overrule a prior judicial construction of the guidelines, it is substantive; if it confirms our prior reading of the guidelines and does not disturb prior precedent, it is clarifying." (quotation marks omitted)). Because endorsing *Specialty Healthcare* would require this Court to overrule its *Lundy* decision, the rule is by definition substantive, rather than clarifying. [12]

---

[12] The majority of the academic literature addressing this issue also agrees that the Board has changed its standards, rather than merely clarifying them. *See* Zev J. Eigen & Sandro Garofalo, *Less Is More: A Case for Structural Reform of the National Labor Relations Board*, 98 Minn. L. Rev. 1879, 1890 (2014) ("[I]n the highly controversial Specialty Healthcare & Rehabilitation Center decision, the Board *radically changed* its historical 'community of interest' standard for determining the scope of appropriate bargaining units." (emphasis added)); Tanja J. Thompson & Brenda N. Canale, *Has* Specialty Healthcare *Changed the Landscape in* (Continued)

It is axiomatic that one cannot explain a departure when one denies the departure's very existence.  This is precisely what the Board has done here with the adoption of its "overwhelming-community-of-interest" test.  In looking exclusively at the petitioned-for unit and adopting the overwhelming-community-of-interest test, *Specialty Healthcare* does not clarify the long tradition outlined above; it overrules every single case in that line.  *See id.* at 18 (Hayes, dissenting) ("The majority purports to apply 'traditional community-of-interest' principles in making unit determinations for nonacute health care facilities. However, their definition of these principles is far from traditional and will have the intended dramatically different results in appropriate unit determinations for all industries.").  Because *Specialty Healthcare* overruled a long line of cases, rather than simply clarifying those cases' meaning, the Board was required to develop an adequate, reasoned explanation for its decision.  *Lundy*, 68 F.3d at 1583; *LeMoyne-Owen Coll.*, 357 F.3d at 60; *J.P. Stevens*, 623 F.2d at 329.  Because the Board

---

*Organizing and Representation Proceedings?*, 29 ABA J. Lab. & Employment L. 447, 450 (2014) ("In truth, however, *Specialty Healthcare* did not 'clarify' an old standard for election cases; rather, it created a new standard--one that establishes a virtually impossible hurdle for employers to overcome."); Edward Phillips, *The Law at Work: New NLRB 'Quickie Election' Procedures*, 48 Tenn. B.J. 30, 31 (2012) ("In *Specialty Healthcare*, the NLRB reversed two decades of board law, changing the standard for determining the appropriateness of a bargaining unit."); *but see* William H. Haller, *Tempest in a Bedpan? The* Specialty Healthcare *Controversy*, 29 ABA J. Lab. & Employment L. 465 (2014).

failed to do so, the overwhelming-community-of-interest test cannot be given legal effect.

## IV.    THE ADOPTION OF THE OVERWHELMING-COMMUNITY-OF-INTEREST TEST VIOLATED THE ADMINISTRATIVE PROCEDURE ACT.

Even beyond the reasons identified in *Lundy* that control the outcome here, the test adopted in *Specialty Healthcare* is invalid for another independent reason.  The Board violated jurisprudential norms by reaching out beyond the facts of the case and adopting a rule of general application that neither party requested.  Because the Board wanted to proceed via adjudication to decide an issue, it was incumbent upon it to wait until it had a case in which the issue was ripe for decision.  Otherwise, as set forth below, it was obligated to proceed via rulemaking.  Further, the quasi-rulemaking that the Board attempted through the solicitation of amicus briefs in *Specialty Healthcare* did not comply with the Administrative Procedure Act ("APA").

The decision to proceed via rulemaking or adjudication rests with the Board in the first instance.  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293 (1974).  Still, there is a limit on the Board's discretion.  *Id.* at 294.  Establishing rules of broad-scale, general application that conflict with prior precedents must be done via rulemaking, where the strictures of the Administrative Procedure Act govern the process.  *See Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981)

("[A]n agency must proceed by rulemaking if it seeks to change the law and establish rules of widespread application."); *Specialty Healthcare*, 357 NLRB No. 83, at 15 (Hayes, dissenting) ("[T]he majority is overstepping the bounds of its discretion in making sweeping changes to established law through this adjudication, without adhering to any approximation of a rulemaking procedure that would comply with requirements under the Administrative Procedures Act (APA) designed to safeguard the process by ensuring scrutiny and broad-based review."); *cf. N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 305 (4th Cir. 2010) ("[T]he general nature of rulemaking enables uniform application across industries, lessens the likelihood of distortions caused by the influence of individualized facts in cases, and also makes the resulting rules readily accessible in a single location."); *Nueces Cnty. Navigation Dist. No 1 v. Interstate Commerce Comm'n*, 674 F.2d 1055, 1065 (5th Cir. 1982) ("[R]ulemaking was particularly appropriate . . . to consider the adoption of a new standard of common control that would transcend the interests of the particular petitioners . . . .").  Promulgating such rules via adjudication is an abuse of discretion.  *Pfaff v. U.S. HUD*, 88 F.3d 739, 748 (9th Cir. 1996).

Here, the Board exceeded the reasonable boundaries of the adjudicative process and abused its discretion.  The Board took a case ostensibly about the presumptions regarding bargaining units in non-acute health care

facilities and used it as a vehicle for rewriting the rules for bargaining units in all workplaces, despite neither party requesting such a broad overhaul of the law. In doing so, it overruled fifty years of precedent in another substantive area of law without an acknowledgement that it was doing so.

The present case demonstrates the wide-ranging effects of the Board's supposed clarification of the law. The seminal Board decision in determining the appropriateness of separate maintenance units is *American Cyanamid Co.*, 131 NLRB 909 (1961), released more than fifty years ago. There the Board held that it would "examine on a case-by-case basis the appropriateness of separate maintenance department units." *Id.* at 912. Since then, decisions in countless cases involving myriad fact patterns have created a huge body of law in this area. Over time, in the American common-law legal tradition, both employers and unions have relied on this body of law in making decisions on how to structure the workplace and in determining what types of bargaining unit to petition and represent. And yet the Board saw fit to attempt to eradicate the entire body in a separate case that had nothing to do with production and maintenance employees (or even the manufacturing industry in general). It is no longer clear what circumstances constitute sufficient integration of production and maintenance employees to justify denial of a separate maintenance unit. This was a dramatic

shift in the law that required an opportunity for notice and comment in the absence

of a case presenting an appropriate factual context.[13]

      While the Board is free to develop its law via adjudication, there are

consequences for doing so. It must wait for a case with the proper facts and a party

making the proper legal arguments before it can change the law in a certain area.

The Board did not do that in *Specialty Healthcare*, so it should be overturned as

applied outside of the non-acute hospital context.

      Perhaps recognizing the breadth of its impending decision in *Specialty*

*Healthcare*, the Board solicited briefs from the parties and amici on eight questions

in advance of its opinion. *See* 356 NLRB No. 56 (2010); *cf. Manufactured Hous.*

*Inst. v. EPA*, 467 F.3d 391, 399 (4th Cir. 2006) ("EPA's attempts to comply with

APA notice-and-comment procedures suggest that the agency believed them to be

applicable."). To the extent that the Board did so as some kind of effort to appear

to comply with the APA, that effort failed. The APA requires, among other things,

that a notice of proposed rulemaking be published in the Federal Register and that

any Rule be published 30 days prior to its effective date. 5 U.S.C. § 553. These

---

[13] Further, neither party in *Specialty Healthcare* requested the type of broad-scale revisions the Board made. The Board's decision to do so *sua sponte* was another abuse of discretion—and demonstrates once again that its intent was to effect the kind of "stealthy" rulemaking that violates the APA. The Board would have been justified in highlighting the issue and assuming, without deciding, that the traditional standards still governed, but that is not what the Board chose to do. Instead, it issued what was essentially an advisory opinion that neither party requested.

rules apply unless the agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B); *see also id.*, § 553(d)(3). Obviously, none of the Board's actions in this case met those requirements. Thus, the Board's "overwhelming-community-of-interest" test cannot be sustained as an exercise of its rulemaking power.

## V.    REGARDLESS OF THE TEST USED, ORDERING AN ELECTION FOR ONLY THE MAINTENANCE EMPLOYEES WAS CONTRARY TO THE LAW OF THIS CIRCUIT.

This case is *Lundy* revisited. The Regional Director, applying *Specialty Healthcare* as he was required to do, seized on insignificant differences between the production and maintenance employees, ignored or downplayed the substantial similarities between the two groups, and used a novel legal standard to effect the exclusion of employees that the Union wanted excluded. Just as in *Lundy*, the Court should hold here that the application of the overwhelming test was inappropriate and that the excluded employees must be part of any unit containing the maintenance employees under the historical community of interest standard.

*Lundy* noted the extensive similarities between the employees in the unions' proposed unit and those excluded. Specifically, the Court focused on the

facts that the excluded employees "performed functions that were essential to the

production process" and that the two groups of employees shared "(1) comparable

wages; (2) identical benefits; (3) the performance of tasks essential to the

production process; (4) similar educational backgrounds; (5) interaction on the

production floor; (6) close physical proximity; (7) the same cafeteria, parking lot,

break rooms, and locker room; and (8) similar performance evaluations." *Lundy*,

68 F.3d at 1580.  The Court also acknowledged the few distinctions between the

two groups: "(1) the method for calculating their earnings; (2) supervision; and (3)

a lack of interchangeability with other P&M positions (other P&M employees did

not perform the work of quality control employees in their absence)." *Id.*  The

court concluded that "[t]he exclusion of quality control employees based on such

meager differences is, to say the least, problematic under the 'community of

interest' standard." *Id.* at 1581.

　　　　　So too here.  The similarities identified by the *Lundy* court are equally

applicable here.  It is not clear from *Lundy* how "comparable" the wages were in

that case, but there is wage overlap here.  Likewise, the employees here share

identical benefits.  Both groups perform tasks essential to the support of the

production process.  The record is quiet on the parties' educational backgrounds,

but certain maintenance employees and certain production employees are required

to obtain licenses to hold their positions.  The employees interact daily and

frequently on the production floor. They work in close physical proximity. They use the same cafeteria, parking lot, break rooms and locker room. They receive identical annual evaluations.

Additionally, the production and maintenance workers at the BOC have additional similarities not even identified in *Lundy*, including that nearly half of the current maintenance employees began working at Dreyer's as production employees and that the employees follow the same work place policies articulated in the same employee handbook. Further, the record establishes Dreyer's effort to integrate the two positions even further through the Company's business strategy—the NCE initiative. Moreover, one of the differences in *Lundy* (different methods of calculating earnings) is not present here, making the Board's case for severing the employees into multiple units even less defensible. In light of these powerful similarities and meager differences, *Lundy* dictates as a matter of settled precedent that any bargaining unit containing the maintenance employees must also include the production employees.

Accordingly, remand to the Board is inappropriate. This case is so closely governed by *Lundy* that as in *Lundy*, the Board's decision should be overturned and the petition should simply be dismissed.

## **CONCLUSION**

For the reasons set forth above, Dreyer's respectfully requests that this Court grant review and deny enforcement of the Board's November 5, 2014 Decision and Order and dismiss this case.

Dated: January 6, 2015.

s/ Bernard J. Bobber

Bernard J. Bobber
Ryan N. Parsons

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Voice: 414.271.2400
Facsimile: 414.297.4900

## <u>STATEMENT ON ORAL ARGUMENT</u>

Nestlé-Dreyer's Ice Cream ("Dreyer's") respectfully requests that this Court grant oral argument in this case. This petition challenges a dramatic change in the standard applied by the National Labor Relations Board in the determination of an appropriate bargaining unit in circumstances in which a union seeks to exclude most of the employees in a manufacturing facility. Oral argument will assist the Court in its understanding of the issues presented in this petition.

## <u>FORM AND LENGTH CERTIFICATION</u>

I hereby certify that this brief conforms to requirements of Rule

32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  This brief is 12,296

words, excluding those portions of the brief excluded by Rule 32(a)(7)(B)(iii).

Dated: January 6, 2015.


<u>s/ Bernard J. Bobber</u>
Bernard J. Bobber

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 6, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I hereby certify that the foregoing document was served on the counsel of record by using the CM/ECF system.

Dated: January 6, 2015.

s/ Bernard J. Bobber
Bernard J. Bobber